# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7385 | **DATE** | 4/11/2003 |
| **CASE TITLE** | Alisa Simms vs. Blue Cross Blue Shield Assoc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion, Defendant's Motion for Summary Judgment [Doc. 26] is granted in its entirety. All other pending motions are moot and terminated. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| ✔ | Notified counsel by telephone. | | | APR 14 2003 | date docketed | |
| ✓ | Docketing to mail notices. | | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | | date mailed notice | |
| jar/lc | courtroom deputy's initials | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALISA SIMMS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 7385 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| BLUE CROSS BLUE SHIELD ASSOC., | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**

APR 1 4 2003

## MEMORANDUM OPINION AND ORDER

This is an employment discrimination case. Plaintiff Alisa Simms, an African-American

woman, alleges that Defendant Blue Cross Blue Shield Association promoted white employees

while refusing to promote her because she is African-American and then fired her in retaliation

for her complaints of discrimination and because she is African-American. This case comes

before the Court now on Defendant Blue Cross Blue Shield's Motion for Summary Judgment.

### I.    Factual Background

Plaintiff Alisa Simms ("Plaintiff" or "Simms") is an African-American woman who

worked for Defendant Blue Cross Blue Shield Association from February 1997 through June

2001. (Def. Facts, ¶¶ 1, 3, 4.)[1] Defendant Blue Cross Blue Shield Association ("Defendant" or

"Blue Cross") is a non-profit organization that serves as an association and licensor for 43

independently owned and operated Blue Cross Blue Shield Plans. (Def. Facts, ¶ 2.) Simms began

_____

[1]The Court has drawn the bulk of these facts from the statements of facts that the Plaintiff
and Defendant have submitted pursuant to Local Rule 56. Unless otherwise noted, the facts
listed here are not in dispute. The abbreviation "Def. Facts" refers to Defendants Rule 56.1
Statement of Undisputed Facts. The abbreviation "Pl. Facts" will refer to Plaintiff's Rule
56.1(b)(3)(B) Statement of Additional Facts.

1

working as a secretary for Defendant in February 1997 as a temporary worker, and she became a full-time employee in July 1997. (Def. Facts, ¶ 3.) In June 1999, Simms was promoted to the position of coordinator. (Def. Facts, ¶ 3.) Simms entire employment at Blue Cross was within the "Blue Card Division." (Def. Facts, ¶ 9.) The Blue Card Division provides the operational mechanism for individual state-by-state Blue Cross Blue Shield health plans to be linked with each other. (Def. Facts, ¶ 10.)

Gerrie Dozier, an African-American woman, interviewed Simms in 1997, and recommended that Defendant hire Simms. (Def. Facts, ¶¶ 12, 13, 17.) In June 1999, when Simms was promoted to coordinator, Dozier was responsible for implementing the promotion. (Def. Facts, ¶27.) For the duration of Plaintiff's employment with Blue Cross, Dozier was her supervisor. (Def. Facts, ¶¶ 9, 12.) Frank Coyne, a white man, was Dozier's supervisor throughout Simms' employment with Defendant. (Def. Facts, ¶ 13.)

After Plaintiff had been working for Defendant for nearly a year, in early 1998 she informed Dozier that she felt Frank Coyne had problems dealing with people of color. (Def. App., Ex. A at 94.) Simms perceived that Frank Coyne would not speak to her or her African-American co-worker, Lawanda Solomon. (Def. Facts, ¶ 142–144.) Dozier informed Coyne of Simms' complaint. (Def. App., Ex. A at 95.) Shortly after the complaint, Coyne made a concerted effort to say good morning and such to Simms, but Simms felt that his efforts only lasted for a couple of weeks. (Def. App., Ex. A at 95, 116.) Nevertheless, Simms did not complain about racial discrimination at Blue Cross again until March 2001. (Def. App., Ex. A at 120–121.)

When she began working for Defendant, Simms' duties included typing, filing, answering

phones, helping with special projects, mailings and other general administrative tasks. (Def. Facts, ¶ 18.) During 1998, Simms began to have responsibility for posting, editing, and maintaining content on the Blue Web website. (Def. Facts, ¶ 19.) Simms enjoyed working on the website. (Def. Facts, ¶ 25.)

When Simms was promoted in June 1999, she thought her new position would entail a significant increase in website related work and a more significant pay raise. (Def. Facts, ¶ 30.) On June 21, 1999, she sent a memo to Del Nagy, then-director of Blue Card, and Frank Coyne suggesting further revisions to her job description that would lead to more work in web development. (Def. Facts, ¶31; Def. Appendix Ex. Supp. Mot. Sum. J., Ex. A at Dep. Ex. 17(a).)[2] She sent the same memo to the same recipients on July 15 but with a more refined job description attached. (Def. Facts, ¶ 31; Def. App., Ex. A at Dep. Ex. 17(b).) Simms and Dozier recall Dozier's response to the memo differently. In her deposition, Simms testified that Dozier suggested to her that a further promotion would happen in August of 1999. (Def. Facts, ¶ 32.) Dozier testified that she told Simms her position would be re-evaluated if the amount of web development work changed. (Def. Facts, ¶ 33.)

The record reveals that Dozier had a meeting with Simms on July 16, 1999 to discuss the memos. (Def. App., Ex. A at Dep. Ex. 17(b).)[3] An internal memo detailing what took place at

---

[2]Defendant's Appendix of Exhibits in Support of its Motion for Summary Judgment will be abbreviated as "Def. App." with accompanying Exhibit identifier (e.g. Ex. A, Ex. B, etc.).

[3]It is unclear whether this was a meeting specially called to discuss the memos or whether it was a regular meeting at which the memos were discussed. The title of the memorandum detailing the meeting is "Bi-weekly meeting with support," which would support an inference that this was a regular meeting at which the memos were discussed. The reason the meeting was called, however, is immaterial.

the meeting signed by both Dozier and Simms indicates that Dozier was going to re-evaluate

Simms' job description three months after August 2, 1999. (Def. App., Ex. A at Dep. Ex. 17(b).)

The second page of the memo indicates that Bill Schneider of the Human Resources department

met with Plaintiff about the volume of non-work related email she was sending. (Def. App., Ex.

A at Dep. Ex. 17(b).) The memo further indicates that Dozier discussed Plaintiff's personal

phone calls and time away from her desk talking with other of Defendant's employees. (Def.

App., Ex. A at Dep. Ex. 17(b.).) Besides this conversation with Dozier and the June and July

memos, Simms made no further efforts to have her job description changed in 1999 or 2000.

(Def. Facts, ¶ 46.)

### A.   SIMMS' PERFORMANCE EVALUATIONS AT BLUE CROSS, 1998-2000

Gerrie Dozier was responsible for conducting Plaintiff's annual performance reviews.

(Def. Facts, ¶ 63.)   Simms received her first performance review in June 1998, and it was

generally positive. (Def. App., Ex. A at Dep. Ex. 20.) In most categories, Simms was meeting

and at times surpassing her supervisor's expectations. (Def. App., Ex. A at Dep. Ex. 20.) The

1998 review revealed only two areas of weakness, neither of which received much emphasis in

the narrative portions of the review.[4]  This review was signed by Frank Coyne, Gerrie Dozier,

and Alisa Simms on June 18, 1998.

Frank Coyne's role in the review process was usually perfunctory. For annual reviews

that were positive, Coyne would sign off on the final version of the employee's evaluation. (Def.

---

[4]The two areas of weakness were: (1) organizing and maintaining all of the department's
chronology and subject files (where Plaintiff was "meet[ing] minimum expectations"); and (2)
interacting courteously and professionally with peers, subordinates and other employees. Only
the former weakness was discussed at all in the narrative portion of the evaluation.

4

Facts, ¶ 65.) If an employee were going to receive a negative evaluation, the direct supervisors, such as Dozier, would show Coyne drafts of reviews before they were finalized. (Def. Facts, ¶¶ 63–64.)

Simms' next review came in March 1999. This review was also generally positive. (Def. App., Ex. A at Dep. Ex. 21.) In most categories, Simms was again meeting and at times surpassing her supervisor's expectations. (Def. App., Ex. A at Dep. Ex. 21.) The March 1999 review did indicate, though, that Plaintiff "needs to improve her communication skills, which effects her working relationship with other staff in the department." (Def. App., Ex. A at Dep. Ex. 21.) The review marked a few other areas where Plaintiff needed to improve, but none of them received any attention in the narrative portions of the review.[5] The review's final recommendation was that Plaintiff "should take a . . . communication course to establish successful working relationships and developing effective verbal and nonverbal skills." (Def. App., Ex. A at Dep. Ex. 21.) This review was signed by Gerrie Dozier and Alisa Simms on March 26, 1999. (Def. App., Ex. A at Dep. Ex. 21.) Frank Coyne had no part in the March 1999 evaluation. (Def. App., Ex. B at 18.) Simms disagreed with the assessment of her performance, but she did not file a written response or objection. (Def. Facts, ¶ 68.)

Simms' third annual review occurred in March 2000. For this review, Defendant employed for the first time a numeric rating system on a scale of one to five, with five being the highest rating. Her review contained several areas where she could improve, including her

---

[5]This review indicated that Simms needed improvement in: "Express[ing] self orally in one-on-one situations and/or in presentations to large/small group"; "Adapts to work relationships with fellow professionals from diverse cultural backgrounds"; and "Demonstrates appropriate initiative in recognizing and solving problems."

ability to understand the big picture, her communication skills, and her capacity to apply her skills to areas of her work other than the website projects. (Def. App., Ex. A at Dep. Ex. 22.) Simms' overall rating on her March 2000 review was 2.87. (Def. App., Ex. A at Dep. Ex. 22.) This places her in the range of 2.4 to 3.5, which the ratings explain means that the employee is "meeting between 76 percent and 100 percent of the total value" of the various tasks described. (Def. App., Ex. A at Dep. Ex. 22.) This review was signed by Gerrie Dozier and Alisa Simms on March 22, 2000; Frank Coyne signed this review on March 23, 2000. (Def. App., Ex. A at Dep. Ex. 22.) Simms disagreed with parts of her March 2000 review, but she did not submit a written response or objection. (Def. Facts, ¶ 73.)

**B.    PLAINTIFF'S EMPLOYMENT RECORD FROM MARCH 2000 THROUGH TERMINATION, JUNE 2001**

Between March 2000 and Plaintiff's termination in June 2001, Dozier spoke to Plaintiff on various occasions about the way she was doing her work, and how Dozier thought Plaintiff should change. (Def. Facts, ¶ 74.) Although Simms recalled those conversations with Dozier, Simms does not recall any specific complaints Blue Card employees made about her work. (Def. Facts, ¶ 76.) Simms also does not recall receiving any complaints directly from her fellow employees about her work. (Def. Facts, ¶ 77.)

In late summer of 2000, Plaintiff applied for an executive secretary position with Dexter Coolidge, the Vice-President of her division.[6] She was not hired to fill the position. Coolidge testified that he had a general impression of her not being "energetically interested" in the

---

[6]Plaintiff disputes the date of the application. Defendant places the date in September 2000, Plaintiff points out that there is a difference in the testimony about the date. Plaintiff's deposition testimony indicates "September or October," whereas the Vice-President's deposition testimony indicates "the summer of 2000." The actual date of the application is immaterial.

position. (Def. App., Ex.D at 13.) Coolidge also spoke to Dozier about Simms in the application process. (Def. Facts, ¶ 38.) Dozier informed Coolidge that Simms had difficulty following through on tasks without reminders from other employees. (Def. App., Ex.D at 16 & Dep. Ex. 1.)

In October 2000, Dozier spoke with Deborah Bandura, a Human Resources Manager for Defendant about Plaintiff's job performance. (Def. Facts, ¶ 78.)[7] Dozier believed that Simms was unhappy in a support position, that she wanted more web work and more money. (Def. App., Ex. E at Dep. Ex. 1.) Dozier wanted to put Simms on a performance improvement plan, which is a formal mechanism Defendant utilizes for employees that are failing to meet expectations. (Def. App., Ex. E, ¶ 8.) Bandura informed Dozier that it was too early to take such a serious step, but that a performance improvement plan could be considered after her next annual review. (Def. App., Ex. E, ¶ 9.) According to Bandura's notes of the meeting, Dozier also informed her that Simms believed that Frank Coyne was not acknowledging her. (Def. App., Ex. E at Dep. Ex. 1.)

From November 2000 through February 2001, there were four tasks that Simms was required to complete where either her fellow employees sent her reminder e-mails to complete the tasks or she performed the task unsatisfactorily from Defendant's perspective. (Def. Facts, ¶¶

---

[7] In Plaintiff's response to Defendant's Facts, Plaintiff denies this fact on the basis of a hearsay objection. In an employment discrimination case, statements such as this, which relate to the employer's perception of the employee's job performance are not hearsay when they are offered to rebut the Plaintiff's allegation of discriminatory motive. Plaintiff's blanket assertion that statements not offered for their truth are "irrelevant and immaterial under Local Rule 56.1" is without foundation. Moreover, evidentiary objections are out of place in responses to statements of undisputed facts under Local Rule 56.1. Well-founded evidentiary objections should be brought in a motion to strike. Motions to strike based solely on evidentiary objections, however, should only be brought in egregious cases, as the Court is familiar with the rules of evidence and will apply them as necessary to the exhibits in support of summary judgment. This is not an egregious case.

80–85, 89–90.)[8]  The most serious incident in that time period occurred on January 17, 2001.  On

that day, Blue Card employee Kathleen Tunney reported to Human Resources Manager Deborah

Bandura that Simms was "disappearing" from her desk and that she reported to work at 11:00

a.m. that morning. (Def. App., Ex. E at Dep. Ex. 2.)  According to Bandura's contemporaneous

notes, Tunney told Bandura that "no one gives her work because they don't feel it will be done."

Tunney did not know what to do about the situation because Dozier was out of the office that

day. (Def. App., Ex. E at Dep. Ex. 2.)  Bandura instructed Tunney to counsel Simms about these

problems, and that this would be considered verbal counseling. (Def. App., Ex. E at ¶ 11 and

Dep. Ex. 2.)

Despite these problems, in December 2000, Dozier asked Simms if she would be

interested in applying for a promotion for doing Blue Web work.  (Def. Facts, ¶41.)  Simms had

been interested in doing more website work since she began to work on the website in 1998.

Simms testified that Dozier told her she would need to take additional web classes, then Dozier

"would see" about having Simms promoted. (Def. Facts, ¶ 51.)  Simms and Dozier did not

discuss the possibility of Simms' promotion again until Simms broached the subject on March 2,

2001. (Def. Facts, ¶¶ 49, 50.)  Simms asked Dozier about the paperwork for her promotion, and

Dozier told her he needed to talk to Frank Coyne about it. (Def. Facts, ¶53.)  Dozier told Simms

a few days later that Frank Coyne had not reviewed her promotion paperwork because Coyne had

not had time. (Def. Facts, ¶ 54.)

Simms approached Coyne on March 5, 2001, to ask him directly about her promotion.

---

[8]In these facts, Plaintiff disputes the characterization that her fellow employees "had to"
remind her to complete these tasks.  The Court will only consider these facts to the extent that
Plaintiff was reminded to complete the tasks.

(Def. Facts, ¶ 55.) Coyne told Simms he had not had time to review her promotion paperwork and that he was waiting "to see where [the company] w[as] going as far as BlueCard is concerned." (Def. Facts, ¶ 55; Def. App., Ex.A at 201.) Simms and Coyne do not remember the details of the incident the same way. Simms testified in her deposition that she told Coyne she thought his failure to address her promotion was unfair and that she was being discriminated against. (Def. App., Ex. A at 215.) Coyne testified in his deposition that Simms did not mention discrimination in their conversation on March 5, 2001. (Def. App., Ex. C at 15.) The Court will address the significance of this disagreement in the discussion section below.

What is not in dispute is that Simms knew, at the time of this conversation, that the Defendant was implementing changes to the BlueWeb system. (Def. Facts, ¶ 59.)[9] The changes being made to the website would allow every employee in the Blue Card division to post his or her own materials to the web without bringing them to Simms or any other administrative employee. (Def. Facts, ¶ 60.) Simms was aware that this change would lead to a decrease in the amount of web work she would do. (Def. Facts, ¶ 61.)

### 1. Simms' 2001 Performance Review

In March 2001, Simms received her next performance review. (Def. Facts, ¶ 91.) Simms was expecting to receive a negative evaluation. (Def. Facts, ¶ 93.) In her evaluation, which was made on the same one to five scale as the 2000 evaluation, she received an overall score of 2.07. (Def. Facts, ¶ 92.) According to Frank Coyne, a score of 2.07 is "extremely low." (Def. App.,

---

[9]Plaintiff disputes Defendant's characterization that she was "well aware of the changes . . . to the way materials were posted to the website." (Def. Facts, ¶ 59.) Plaintiff's Deposition testimony reveals that she "knew there was going to be a new system of BlueWeb . . that would involve a change in how matters would be posted [to the website]." (Def. App, Ex. A at 202.) The Court's formulation here reflects Plaintiff's Deposition testimony.

Ex. C at 25.) This evaluation noted that Simms had problems performing many areas of her job duties. Specifically, it noted that: she needed "to improve her administrative support to staff in BlueCard"; she "leaves the area for long periods of time without notifying her co-workers or supervisor of her whereabouts"; she "does not always provide/portray a friendly customer focused attitude"; "her constant negative attitude is affecting every area of her work"; she "has not demonstrated acceptable customer focus on a constant basis when it comes to answering the phones or assisting staff"; and her failure to report to management when she was going to be late "shows a disregard for policy." (Def. App., Ex. A at Dep. Ex. 41.) Simms disagreed with most of this evaluation and refused to sign it. (Def. Facts, ¶¶ 95–96.)

Before the 2001 evaluation was finalized, Frank Coyne reviewed drafts of Simms' evaluation. (Def. Facts, ¶ 97.) Dozier shared at least two drafts of the evaluation with Frank Coyne, and Coyne made written comments on the drafts. (Def. App., Ex. C at Dep. Exs. 1–2.) Coyne's written comments on the draft evaluations inform Dozier to be "specific", "evaluate" and "expand" about Simms' work. (Def. Facts, ¶ 99.) Coyne testified at his deposition that he wanted Dozier to be sure that the narrative portion of the review matched the numeric evaluation. (Def. App., Ex. C at 21.) Coyne also testified that he did not contribute to the substantive review or the numeric ranking on Simms' evaluation. (Def. Facts, ¶ 100.) Dozier testified in her deposition that Coyne never told her to lower or raise Simms' evaluation scores and that Coyne's only contribution to Simms' evaluation was to tell her to make sure her numeric rankings matched her comments. (Def. Facts, ¶¶ 102–103.)

Plaintiff submitted to Defendant's Human Resources Department a two-and-a-half page, single-spaced response to her March 2001 evaluation. (Def. Facts, ¶ 105.) In Simms' response,

she takes issue with many of the specific criticisms from her evaluation. (Def. Facts, ¶ 106; Def. App., Ex. A at Dep. Ex. 42.) In her response, she also engages in a series of ad hominem attacks on her supervisor, Gerrie Dozier. (Def. App., Ex. A. at Dep. Ex. 42.)[10] Simms' response did not suggest, explicitly or implicitly, that her poor evaluation resulted from racial discrimination or retaliation for complaints of racial discrimination. (Def. Facts, ¶ 107.) In her deposition, Simms testified that to her belief that she received a poor evaluation because Dozier was upset with her for discussing a potential promotion with Coyne. (Def. Facts, ¶ 104.)

## 2. Simms is placed on a performance improvement program

Defendant requires that employees who receive an evaluation score as low as Plaintiff's be placed on a performance improvement program. (Def. Facts, ¶ 111; Def. App., Ex. C at 25.) The performance improvement program is designed to address performance issues with employees and to develop a strategy for the employee to succeed. (Def. Facts, ¶ 113.) During the program, the employee meets with her manager over a set period of time to establish and discuss specific performance goals. (Def. Facts, ¶ 112.) If those performance goals are not achieved at the conclusion of the performance improvement program, the employee is given a 30 day final warning. (Def. Facts, ¶ 112.)

Simms' performance improvement program was set to last for sixty days. (Def. Facts, ¶

---

[10]In her Local Rule 56.1(b)(3)(A) Response to Defendant's Statement of Undisputed Facts, Plaintiff takes the incredible position that her response does not "attack" Dozier. In her response, Plaintiff writes: "Supervisor-Dozier cannot be trusted at her word because she will say one thing but do another and based on my previous experiences with her she will always be labeled a 'liar' to me"; "Supervisor-Dozier does not even have the understanding of what seeing the big picture means because her thinking is so small minded. I find that she tries to limit or pigeon hold [sic] me as a means of control because of her own incompetence." (Def. App., Ex. A at Dep. Ex. 42.) These statements, among others, can fairly be characterized as attacking Dozier.

115.) During her program, Simms met on a weekly basis with Gerrie Dozier to review her performance and her progress in meeting the goals in her performance plan. (Def. Facts, ¶ 115.) Although he knew of it, Frank Coyne did not participate in the performance improvement program. (Def. Facts, ¶ 116.) Simms thought that her weekly meetings with Dozier were a "waste of time," and that Dozier had already "made up her mind." (Def. Facts, ¶ 117.)

### 3. Simms is given a thirty day final warning

At the end of her 60 day performance improvement program, Simms was given a final warning on May 10, 2001. (Def. Facts, ¶ 118.) Dozier explained to Simms that the final warning provided Simms with a final opportunity to improve her performance, and that if her performance failed to improve, she would be terminated at the end of 30 days. (Def. Facts, ¶ 119.) Simms did not sign the written final warning. (Def. Facts, ¶ 121.)

Four days into her thirty day final warning period, Simms emailed Dozier a request to take ten days of paid time off, starting on May 16, 2001. (Def. Facts, ¶ 123.) Dozier counseled against taking paid leave as requested for three reasons: (1) Simms had only given two days notice; (2) it was a busy time for the Blue Card Division; and (3) it would adversely affect the evaluations during her final warning period. (Def. Facts, ¶ 124.) Simms then asked if five days would be too much time. (Def. App., Ex. A at Dep. Ex. 50.) Dozier again counseled Simms to "seriously consider limiting days off" during the final warning period because "[t]aking days off limits the amount of time that you have at work to demonstrate the required improvement." (Def. App., Ex. A at Dep. Ex. 50.) In the end, Dozier told Simms she "w[ould] leave th[e] decision [about taking time off] up to [her]." (Def. App., Ex. A at Dep. Ex. 50.) Simms took five

days of paid leave during her final warning period. (Def. Facts, ¶ 125.)[11]

On June 6, 2001, Plaintiff met with Gerrie Dozier and a member of the Defendant's Human Resources Department. (Def. Facts, ¶ 127.) At this meeting, Defendant terminated Simms' employment. (Def. Facts, ¶ 128.)

## C.    PLAINTIFF'S ALLEGATIONS OF DISCRIMINATION

In this lawsuit, Plaintiff alleges that she experienced impermissible discrimination while in Defendant's employ in three ways. First, she alleges that Defendant failed to promote her because of her race. Second, she alleges that Defendant fired her in retaliation for making complaints of discrimination. Third, she alleges that Defendant fired her because of her race.

Prior to filing this lawsuit, Plaintiff filed three complaints of discrimination with the EEOC. Plaintiff's first EEOC complaint was filed on April 30, 2001. The April 30 complaint alleges that her poor performance review in March 2001 and Defendant's failure to consider her for a promotion amounted to racial discrimination and retaliation for a complaint of racial discrimination. (Def. App., Ex. A at Dep. Ex. 52.) Plaintiff's second EEOC complaint was filed on June 4, 2001. The June 4 complaint alleges that Defendant discriminated against her on account of her race and retaliated against her for complaining of racial discrimination when she was placed on the 30 day final warning period. (Def. App., Ex. A at Dep. Ex. 53.) Plaintiff's third EEOC complaint was filed on June 7, 2001. The June 7 complaint alleges that her termination was a result of racial discrimination and retaliation for complaints of racial discrimination. (Def. App., Ex. A at Dep. Ex. 55.) On June 27, 2001, the EEOC issued Plaintiff

---

[11]Plaintiff disputes Defendant's characterization of Simms as "persist[ing]" to take five days of paid leave. The Court disregards Defendant's characterization.

a right to sue letter. Within 90 days of receiving the right to sue letter, Plaintiff filed this lawsuit.

## II.    DISCUSSION

Plaintiff's Complaint presents three discrimination claims: (1) failure to promote because of her race; (2) retaliation for complaining of racial discrimination; and (3) termination because of her race. The facts supporting these claims overlap to a fair extent, but the Court will nevertheless treat them separately below.

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); see also Schmidt v. Ottawa Medical Center, P.C., 322 F.3d 461, 463 (7th Cir. 2003). When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and makes all reasonable inferences in her favor. See Haywood v. Lucent Technologies, — F.3d —, No. 01-4092, 2003 WL 1400496, at *3 (7th Cir. Mar. 20, 2003).

It is the moving party's burden to demonstrate the absence of genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a

14

genuine triable issue.  <u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992).

## B.     PLAINTIFF'S FAILURE TO PROMOTE CLAIM

Plaintiff alleges that Defendant failed to promote her both because of her race and in retaliation for her complaints of racial discrimination.  The retaliation aspect of the claim will be addressed separately below.

As with other claims of racial discrimination, Plaintiff can seek to establish Defendant's discriminatory failure to promote in two ways: directly through evidence of discriminatory intent or through the burden shifting method established in <u>McDonnell-Douglas v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Wallace v. SMC Pneumatics, Inc.</u>, 103 F.3d 1394, 1397 (7th Cir. 1997) (discussing both methods).  The Court will analyze the evidence under both theories.

The direct and circumstantial evidence of discriminatory intent Plaintiff marshals in support of her claim is not extensive.  First, she alleges that Coyne's inattention to her application for promotion was due to her race.  In support of this allegation, she points to the promotions of four Caucasian employees: Melanie Tillmans, Lisa Marie Jordan, Mike Kelly, and Rohn Rich. It is difficult to compare these employees to Plaintiff.  First, all four of them work for Defendant at the management level; Plaintiff's position with Defendant was always at the administrative level. (Def. App., Ex. E at ¶ 12.)  Additionally, the Court has been provided with relatively few facts regarding their promotions and the performance that preceded said promotions.

What little is known about their promotions is summarized here.  Tillmans was promoted four times since she was hired in the marketing department in 1985.  She was promoted on March 15, 1986; May 19, 1990; October 5, 1995; and November 4, 2000.  At the time of this litigation, her title was Director of "L & F Admin and Financial Su". (Def. App., Ex. E at Ex. 3.)

15

Jordan was promoted three times since she was hired in Blue Card Project Management in 1997. She was promoted on May 4, 1998; December 16, 2000; and December 1, 2001 (six months after Plaintiff was terminated). At the time of this litigation, her title was managing director of "SRV - Inter-Plan Programs." (Def. App., Ex. E at Ex. 3.) Kelly was promoted three times since he was hired as a marketing assistant in 1995. He was promoted on June 3, 1996; September 1, 1997; and February 10, 2001. At the time of this litigation, his title was "Mgr BlueCard Natl Accounts Corporate Data Center." (Def. App., Ex. E at Ex. 3.) Rohn was promoted once since he was hired as a senior consultant in 1996. He was promoted on May 11, 2001. At the time of this litigation, his title was "Mgr Prog Admin & Ext Relations." (Def. App., Ex. E at Ex. 3.)

While the promotions of these four employees do indicate that Defendant promoted employees, it offers scant circumstantial evidence of discriminatory intent. Looking at this evidence in the light most favorable to the Plaintiff, it could be reasonably viewed as establishing that Defendant promoted its white employees fairly regularly. If there were no evidence that African-American employees were promoted, this could create a genuine issue of material fact requiring denial of summary judgment. Defendant, however, provided evidence of the promotions in Plaintiff's division during Plaintiff's tenure that refutes the inference of discriminatory intent. From 1996 through June 2002, Frank Coyne oversaw 92 promotions within the Blue Card division where Plaintiff worked. Of those promotions, 61 were of Caucasian employees, 24 were of African-American employees, 5 were of Asian employees, and 2 were of Latino employees. (Def. Facts, ¶ 136.)[12] These promotions buttress Defendant's claim

---

[12]In her Local Rule 56.1(b)(3)(A) response to this particular fact, Plaintiff submits "Undisputed that Bandura states as such." Plaintiff makes remarks like this throughout her response to Defendant's Statement of Undisputed Facts. If Plaintiff disputes the accuracy of the

that it does not have a policy of not promoting African-American employees generally.

Plaintiff's own employment experience with Defendant further rebuts the inference of discrimination. After two years in Defendant's employ, when her performance evaluations were still positive, she received a promotion. The promotion may not have been exactly what she wanted at the time, but she nevertheless received it. The direct and circumstantial evidence provides no support for Plaintiff's discriminatory failure to promote claim.

Plaintiff could still proceed under the burden-shifting method of proving discrimination, though. In this method, the Plaintiff must first establish a prima facie case of discrimination. The establishment of a prima facie case creates a rebuttable presumption "that the employer's actions, if unexplained, were the result of impermissible factors". Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003). Next, the burden shifts to the Defendant to proffer legitimate non-discriminatory reasons for failing to promote her. If Defendant proffers such reasons, the burden shifts back to the Plaintiff to demonstrate that those reasons are pretextual. See Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 544 (7th Cir. 2002).

In order to establish a prima facie case of failure to promote, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for, and was qualified for an open position; (3) the plaintiff was rejected; and (4) the employer filled the position with a similarly qualified or less qualified person, or other evidence that would permit an inference of discrimination. See Howard v. Lear Corp. EEDS & Interiors, 234 F.3d 1002, 1005–06 (7th Cir. 2000).

The uncontroverted evidence submitted in connection with the Defendant's summary

---

facts, it is incumbent upon her to submit competent evidence to rebut them.

judgment motion removes all support for Plaintiff's discrimination allegation on the basis of a failure to promote. Although Simms is a member of a protected class, the record demonstrates an absence of material facts that would support two of the remaining three elements of Plaintiff's prima facie case on this theory. The record unequivocally shows that Plaintiff was seeking a promotion to a position that never existed.[13] Although Plaintiff sought a job re-evaluation and promotion to do more work on the website from June 1999 until the time of her termination, Defendant simply never created the position. On two occasions, in August 1999 and in December 2000, Defendant suggested to Plaintiff that it was considering creating the position that she sought. On the second occasion, her supervisor even asked her to fill out paperwork in connection with a promotion to do more work on the website. While this likely fostered an expectation that she might receive such a promotion, at the end of the day, Defendant never created the position Plaintiff was seeking.[14]   In the absence of an open position, the Plaintiff cannot prevail under the burden-shifting framework. Since Defendant never created this position, Plaintiff's claim is further doomed because the position could neither remain open nor could it have been filled. In short, Plaintiff has not shown that she applied for and was qualified for an open position (the second element of the prima facie case) nor can she prove that Defendant filled the position with a lesser qualified person (the fourth element).

---

[13]In its memorandum of law, Defendant generously concedes for the sake of argument that Plaintiff's requested job re-evaluation would qualify as a promotion under Title VII. (Def. Mem. L. Supp. Mot. Summ. J., at 6.) The Court addresses Plaintiffs other arguments in support of the failure to promote claim (re: similarly situated employees) below.

[14]Although it would not be necessary to do so, Defendant provides a legitimate explanation for its unwillingness to create a new position. Plaintiff's department was undergoing an internal change that would result in a diminished need for a specialized individual to be in charge of web development.

In some cases, an open position would not be necessary if a plaintiff could establish that the defendant had a regular policy of promoting employees without open positions. In this case, though, the evidence is clear that the promotion Plaintiff sought was entirely of her own design. In situations like this, it would not make sense to allow plaintiffs to proceed on the theory that a defendant's failure to promote them to a position that they wanted to create was a result of discrimination. Employers are not required to acquiesce to the desires of their employees, especially when it comes to the employee's jobs and job descriptions.

Although Plaintiff cannot establish a prima facie case of failure to promote, Defendant has nevertheless provided legitimate, non-discriminatory reasons for failing to promote her. Defendant proffered two reasons for not promoting Plaintiff: (1) it was restructuring the web development process in a way that would eliminate the need for a specialized employee to be devoted to web development; and (2) Plaintiff's performance was not satisfactory. Both of these reasons are amply supported in the record.[15]

When Plaintiff discussed her potential promotion with Coyne on March 5, 2001, she testified in her deposition that he told her that one of the reasons her paperwork was not done was "to see where we were going with [the website] . . ." (Def. App., Ex. A at 201.) The Blue Card division was in the process of changing the procedure by which documents would be posted to the website, and Plaintiff was aware of the changes. The new process would allow every employee in the Blue Card division to post his or her own materials to the web without bringing them to Simms or any other administrative employee. (Def. Facts, ¶ 60.) Simms knew that this

[15]Plaintiff asserts that her poor performance review was only in retaliation for her discrimination complaints. As we will see below, her position is not supported by the record.

conversion would decrease the amount of web work she would do because she was on the team coordinating the change. (Def. Facts, ¶ 61.) By itself, this is a legitimate reason for failing to promote Plaintiff into the position that she desired.

The additional reason that Plaintiff was not offered a promotion was that her work performance was not satisfactory. During her final year of work for Defendant, her performance evaluation reveals that Plaintiff had significant performance issues at work.[16] Her supervisor, Gerrie Dozier, felt that her negative attitude was pervading all aspects of her work. (Def. App., Ex. A at Dep. Ex. 41.) Another employee felt that Plaintiff could not be trusted to complete her work. (Def. App., Ex. E at Dep. Ex. 2.) Complaints regarding Plaintiff's workplace performance originate from multiple sources within Defendant's organization. The Court finds that these performance problems are well-supported in the record before it, and would provide an additional legitimate reason for failing to promote Plaintiff.

Plaintiff makes no effort to establish that Defendant's first proffered reason for failing to promote her was pretextual. Instead, she concedes that the changes Defendant described taking place to the web development process were being considered at the time of her poor performance review. As the changes to the web development process would be sufficient to deny Plaintiff a promotion (to a position that did not exist before or since Plaintiff's request), Defendant's proffered reasons withstand scrutiny.

Under either the direct or indirect method of proving discrimination, Plaintiff's failure to promote claim cannot succeed. Defendant is entitled to summary judgment on Plaintiff's failure

---

[16]Plaintiff challenges the validity of the performance evaluation as she believes it was low in retaliation for her complaints of discrimination. The Court will address this argument in the retaliation section below.

to promote claim.

## C.    PLAINTIFF'S RETALIATION CLAIM

Plaintiff alleges that Defendant retaliated against her for making complaints about racial

discrimination. The alleged retaliation took two forms: (1) Plaintiff's poor performance

evaluation in March 2001; and (2) Plaintiff's subsequent workplace discipline and termination.

This claim has no merit.

As with her failure to promote claim, Plaintiff can survive summary judgment on the

retaliation claim in two ways: through direct evidence of retaliation or indirect evidence under

McDonnell-Douglas. See Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644

(7th Cir. 2002) ("The plaintiff in a retaliation case should have two . . . distinct routes to

obtaining/preventing summary judgment. One . . . is to present direct evidence . . . The second

route to summary judgment [is] the adaptation of McDonnell Douglas to the retaliation context . .

. .").

### 1. Proof of retaliation by direct evidence

To prove retaliation by direct evidence, Plaintiff must show that she engaged in protected

activity (complaining of discrimination) and suffered an adverse employment action as a result.

Stone, 281 F.3d at 644. Plaintiff has shown that she suffered the following adverse employment

actions: (1) a poor performance evaluation on March 13, 2001; (2) placement on a performance

improvement program with Defendant; (3) placement on a thirty day final warning period with

Defendant; and (4) termination. Plaintiff has also engaged in the following protected activities:

(1) her 1998 complaint of Frank Coyne's racial discrimination to Gerrie Dozier; (2) her March 5,

2001 complaint of racial discrimination to Frank Coyne; (3) her three EEOC complaints between

April 30, 2001 and June 7, 2001.

Of those protected activities, Plaintiff only relies upon her March 5, 2001 complaint of racial discrimination to establish retaliation.[17] This is all Plaintiff could reasonably rely upon. The 1998 complaint is too distant in time to have served as a source of retaliatory action. Moreover, after Plaintiff registered the 1998 complaint, she testified that Frank Coyne's attitude towards her improved; even if the improvements were not sustained over time, it would rebut any inference of retaliation. As for the EEOC complaints, there is no evidence in the record that Defendant was even aware of Plaintiff's complaints prior to her termination. In order to take retaliatory action, a party must at a minimum know for what it is retaliating.

There is no dispute, however, that Plaintiff's March 5, 2001 complaint of racial discrimination would be protected activity. Her complaint of discrimination rested on her genuine belief that her employer was treating African-American and Caucasian employees differently when it came to evaluating promotions. This type of complaint is protected under the statute. If Plaintiff can demonstrate a factual issue as to whether there is a causal connection between the protected activity and the adverse employment actions, summary judgment must be denied "unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive." Stone, 281 F.3d at 644.

Although Plaintiff suffered the four adverse employment actions listed above, the central

---

[17]Defendant disputes that Plaintiff actually complained of racial discrimination in her conversation with Frank Coyne on March 5, 2001. This dispute is a classic "he said, she said" that, if it were material, would have to be resolved by a jury. For the purposes of this motion, the Court treats the complaint as having occurred.

adverse action was the March 13, 2001 poor performance review, for the other three adverse

actions followed from that review. If that review was tainted by retaliation, each adverse action

that followed it would be similarly tainted. Additionally, after she received her poor performance

evaluation on March 13, 2001, Plaintiff did not take any of the subsequent measures seriously.

Plaintiff made no efforts to improve her performance during the performance improvement

process. She felt that the weekly meetings with Dozier were a "waste of time." (Def. Facts, ¶

117.) Her lackadaisical approach to the performance improvement process itself could justify the

subsequent final warning period. During that final warning period, Plaintiff took five days of

paid leave against the clear advice of her supervisor. Also during the final warning period, she

became quite flippant with Dozier over an assignment that Dozier believed she had assigned to

Plaintiff.[18] Plaintiff's unbecoming behavior during the performance improvement process and

the final warning would have justified the subsequent adverse employment actions.

Consequently, the critical adverse employment action to this litigation is the initial March 13,

2001 performance evaluation.

The only direct evidence of retaliation that Plaintiff offers is the temporal link between

her March 5, 2001 complaint and her poor performance review on March 13, 2001. Although

temporal proximity alone is often insufficient to defeat a summary judgment motion, see

Franzoni v. Hartmarx Corp., 300 F.3d 767, 772–73 (7th Cir. 2002) ("it is difficult to infer

causation based solely upon the timing of the relevant events"), the close temporal proximity

between the protected behavior and the adverse employment action might be sufficient to create a

---

[18]Plaintiff responded to Dozier's email inquiry about the assignment by asking, "how am I supposed to know I need to work on it, I guess by reading your mind? the way u normally work." (Def. Facts, ¶ 126.)

factual issue to get to the jury if it were unrebutted.

Defendant presents uncontroverted evidence, though, that Plaintiff's poor performance review was already being drafted prior to her complaint of racial discrimination. On February 16, 2001, Dozier submitted an initial draft of Plaintiff's evaluation to Coyne. Coyne's written comments on the draft indicate that Dozier should expand the narrative description in several areas. On March 5, 2001, the day of the complaint, Dozier submitted a second draft of Plaintiff's evaluation to Coyne. Again, Coyne made written comments indicating that Dozier should expand the narrative description of Simms' performance in a few areas. Notably, though, Coyne did not suggest for Dozier to expand her narrative description of Simms' performance in all areas. Nor did Coyne make any specific recommendations to Dozier about Simms' evaluations. The recommendations on the March 5 draft are quite similar in type and tone to the recommendations on the February 16 draft.

Simms' eventual final evaluation contained reasoned complaints about her performance that were amply supported by the complaints regarding her performance at work that are detailed in the factual background set forth at the opening of this opinion. The subsequent adverse employment actions followed logically from this review. Since Plaintiff's poor performance evaluation was not undertaken in retaliation for her complaints, the subsequent actions were justified with the permissible poor performance evaluation. A plaintiff cannot avoid summary judgment simply by claiming that a jury could disbelieve the reasons provided by an employer for making its employment decisions. See Traylor v. Brown, 295 F.3d 783, 791 (7th Cir.2002).

### 2. Proof of retaliation under the indirect method

To establish retaliation under the McDonnell-Douglas framework, Plaintiff must show:

(1) that she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, (3) she was performing her job in a satisfactory manner, and (4) she was treated less favorably than any other similarly situated employee who did not engage in such protected activity. Id. If the plaintiff establishes a prima facie case of retaliation, the defendant must put forth a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise, there must be a trial." Id. A causal link between the protected expression and adverse employment action is not required in the second method. Id. Plaintiff has certainly established that she was engaged in a statutorily protected activity and that she suffered an adverse employment action. What she has failed to demonstrate, though, is that she was performing her job satisfactorily or that she was treated less favorably than similarly situated employees who did not complain. As to the latter point, the record evidence demonstrates the contrary.

Over the last two years of Plaintiff's employment with Defendant, the record reveals that Plaintiff was having progressively more serious performance problems.[19] Defendant can rightfully expect Plaintiff to be at her desk most of the day when she is scheduled to be at work. Employees who "disappear" from their workplaces will often involuntarily disappear from their jobs, and it is the employer's prerogative to discipline employees accordingly. Provided that the discipline is not meted out on a discriminatory or unfair basis, the courts will not intervene.

---

[19]It appears likely that most of these problems originated from a misunderstanding between Plaintiff and Defendant regarding her 1999 promotion and the amount of work she was doing for Defendant's website. Plaintiff wanted to do more website work and be paid more money; Defendant did not need someone to do more website work. This misunderstanding would not be actionable under Title VII.

In addition to failing to perform her job satisfactorily, Plaintiff can point to no similarly situated employee who received more favorable treatment. Plaintiff suggests that two employees were similarly situated to her: Gurv Anand and LaWanda Solomon. Anand is an Asian man who received a poor performance evaluation, but was not placed on a performance improvement program nor was he eventually discharged. Defendant demonstrates that though Anand was treated differently than Plaintiff, he was subject to arguably a more severe discipline: he was demoted by two levels and his pay was reduced by $34,400 for his poor performance. Plaintiff, by contrast, was placed onto a performance improvement program that could have resulted in her retaining her current position at full pay. If anything, Anand's treatment was worse than Simms', not better.

LaWanda Solomon is an African-American woman who held the same position as Simms. Other than being in the same position with Defendant, Solomon is not similarly situated with Simms. There is no evidence or allegation that she suffered any problems with respect to her job performance. While it is true that she received a favorable performance review from Dozier and she did not make a charge of discrimination, that does not mean, ipso facto, that her favorable performance review resulted from failing to make a charge of discrimination. If this implausible logic were accepted plaintiffs in retaliation cases could survive summary judgment with reference to any non-complaining employee who thrived in defendants employ. To be similarly situated, the employee must be in a position where an even-handed policy would result in similar treatment. Though Anand was an employee in Defendant's executive ranks, he was more similarly situated to Plaintiff because he too received a poor performance review.

Because Plaintiff has failed to demonstrate either that she was performing her job

satisfactorily or that similarly situated employees were treated more favorably, Defendant is entitled to summary judgment on her retaliation claim.

### D.  PLAINTIFF'S TERMINATION CLAIM

Plaintiff's final allegation is that she was terminated because of her race. Like the previous two allegations, Plaintiff's evidence in support of the claim is meager at best. As with the other two claims, her termination claim could be proved by direct evidence of discrimination or indirect evidence under the McDonnell Douglas burden shifting method.

Plaintiff offers scant direct evidence of discrimination. The only alleged discriminatory actor in Plaintiff's version of events is Frank Coyne. The evidence unequivocally demonstrates that it was Gerrie Dozier who was responsible for Plaintiff's poor performance evaluation and her eventual termination, not Frank Coyne. As Dozier's supervisor, Coyne had to approve the actions Dozier recommended, but the evidence all demonstrates that it was Dozier, not Coyne, who made the decisions.

Furthermore, the evidence of Coyne's discrimination is exceedingly thin. Plaintiff believes that Coyne had a problem dealing with people of color, yet Plaintiff concedes that Coyne had no problem dealing with Dozier, an African-American woman. Plaintiff asserted that other African-American employees complained of Coyne's attitudes, but she failed to provide any affidavits or deposition testimony from those employees. The direct evidence of discrimination is simply too weak to permit a reasonable jury to return a verdict in favor of Plaintiff on her termination claim.

Plaintiff cannot prevail under the burden-shifting method of McDonnell-Douglas either. A critical element of the prima facie case for discriminatory termination, as with retaliation, is

that the plaintiff was meeting its employers legitimate expectations. <u>See</u> <u>Wells v. Unisource</u> <u>Worldwide, Inc.</u>, 289 F.3d 1001, 1006 (7th Cir. 2002) (relating elements of prima facie case). As discussed above in the retaliation section, Plaintiff was not meeting Defendant's legitimate expectations.

While that enough would be sufficient to doom Plaintiff's claim, Defendant had ample non-discriminatory reasons to terminate Plaintiff. Her work performance was not satisfactory, so she was placed on a performance improvement program for sixty days. When she did not take the performance improvement program seriously, she was given a thirty day final warning to improve her performance. She treated this even less seriously than the performance improvement program, even taking time off during the final warning period. Unsurprisingly, at the end of the thirty days, she was terminated. Defendant had sufficient reason to terminate Plaintiff without inquiring about impermissible motivation. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment." <u>Stone</u>, 281 F.3d at 644. Defendant here is entitled to summary judgment.

## CONCLUSION

For the reasons given above, Defendant Blue Cross Blue Shield Association's Motion for Summary Judgment is granted in its entirety.

**Enter:**

_(signature)_

**David H. Coar**
**United States District Judge**

**Dated: April 11, 2003**